HOME TRUST COMPANY, RESPONDENT, v. SAM SHAPIRO ET AL., APPELLANTS.—64 S. W. (2d) 717.

Kansas City Court of Appeals. November 6, 1933.

268

*Ringolsky, Boatright & Jacobs* and *Daniel S. Millman* for respondent.

*B. M. Achtenberg* and *Trusty & Pugh* for appellant.

REYNOLDS, C.—The plaintiff, Home Trust Company, respondent herein, is a banking corporation engaged in business at Kansas City, Missouri. In February, 1924, it desired to find new business quarters. At that time, Alexander Rieger was its president, Nathan Rieger its treasurer, Gus A. Sievers its vice-president, and Sam Wedlan its secretary. For these new quarters, it selected the building at 1117-1119 Walnut street, Kansas City, Missouri, and at once began negotiations for the same. At such time, it appears that the Columbia Realty Company, a corporation, was the owner of the unexpired term of a ninety-nine year lease thereon and had subleased the same to the defendant Childs Company, a corporation, for a term beginning March 1, 1920, and expiring February 28, 1940. The Childs Company had by different leases sublet each of the floors in said building, except the first floor and the basement, to different tenants for various terms, each of whom was in possession of the floor leased him. Among these subtenants was the defendant Shapiro, in possession of the second floor of the building under a written lease of date May 23, 1922, for a term expiring July 31, 1930, where he was conducting a wholesale business in ladies' ready-to-wear goods. A clause in the lease under which he held provided that the lessor might terminate the same at any time before maturity if it should dispose of its leasehold or should make a *bona-fide* lease for the entire building to one tenant, upon giving the lessee six months' written notice and upon the further condition of paying the lessee the sum of thirty-five hundred dollars upon the

delivery of the premises under said clause, should said lease be terminated between August 1, 1924, and July 31, 1927. For the purpose of acquiring said building through the merger and ownership of the outstanding leases thereon, the plaintiff entered into negotiations with the Columbia Realty Company, hereinafter called Realty Company for convenience, and caused said company to procure the surrender or assignment to it by the Childs Company of its unexpired leasehold on said building, reserving to the respective subtenants their rights under their respective subcontracts, which surrender was accomplished through written instrument executed by Childs Company to the Realty Company under date of February 28, 1924, to become effective April 1, 1924. It also appears that the Realty Company acquired by assignment from Childs Company the various leases with the subtenants in said building, including the lease with the defendant Shapiro. At the same time, plaintiff purchased from the then owners thereof the entire issued and outstanding shares of stock in the Realty Company and caused the same to be assigned and transferred to Gus A. Sievers, Sam Wedlan, and Nathan Rieger, certain of its officers, for its benefit; and subsequently thereto, on May 31, 1924, the Realty Company transferred to plaintiff by assignment the unexpired term of the ninety-nine year lease held by it and dissolved as a corporation.

Upon the acquisition by plaintiff of the stock of the Realty Company as hereinbefore indicated, it appears that plaintiff's officers holding said stock became and acted as the officers of the Realty Company and conducted and managed its affairs. Gus A. Sievers became its president and Sam Wedlan its secretary. It seems to have been continued as a separate entity for plaintiff's convenience in executing its plan for acquiring said building and the dominant lease thereon until all the details of said plan had been satisfactorily worked out and the deal for said building and the merger and ownership of said leases accomplished when it was dissolved by said officers as its sole stockholders.

It was the further intention and desire of the plaintiff, upon the acquisition of the stock of the Realty Company, the surrender to it of the Childs·Company lease, its merger with the ninety-nine year lease, and the assignment to it of the various leases of the subtenants in February, 1924, to obtain immediate possession through the Realty Company of the first floor and basement of said building which it desired to have remodeled and improved for its own occupancy and also in connection therewith and at the same time to have remodeled, altered, and improved the remainder of said building at an estimated cost of about eighty thousand dollars ($80,000). Plans and specifications had been prepared therefor. There being no provisions for an entry for such purpose in his contract, defendant Shapiro objected on account of the necessary interruption and interference with the

operation of his business that would follow and refused to consent to the work being done. A number of conferences were had with the same result, whereupon the plaintiff determined to have the Realty Company take advantage of the termination clause in the lease contract and obtain possession of the premises for it with as little delay as possible, so that it might proceed with its plan. It advised Shapiro of its intention and of the fact that in doing so it would be required to advance and pay the sum of thirty-five hundred dollars to become due him in such event. The Realty Company, thereupon, during the latter part of March, 1924, caused him to be served with a written notice from the Childs Company, reciting the fact of his lease with the Childs Company and continuing as follows: "You are hereby notified that the undersigned do hereby terminate and cancel the said lease on October 1, 1924. The amount specified to be paid you in the event of said termination will be paid to you on such date in cash." The notice further recited that the Childs Company had disposed of its leasehold estate in the entire building and that it was to give possession on March 31, 1924. The Realty Company also endorsed its approval thereon. The Realty Company had an arrangement with the Childs Company, in consideration of the giving of said notice, to hold it harmless from any liability incurred by reason of the giving of the same, and to hold it harmless from the payment of the $3,500 provided to be paid defendant Shapiro in the event of the termination of his lease under the termination clause in said contract; and under said arrangement, it caused to be deposited in escrow with the defendant Commerce Trust Company, a banking corporation at Kansas City, Missouri, hereinafter for convenience called Commerce Company, the sum of $3500 in the form of a treasurer's check, the same being accepted by the defendant Commerce Company with the understanding that it was not in any event to be paid the defendant Shapiro except upon the written consent of both the Realty Company and the Childs Company, to which understanding both assented. It does not appear from the record that the defendant Shapiro was in any way a party to said arrangement.

Upon the service of the notice of termination, defendant Shapiro continued in possession under his lease; and such negotiations were had between the Realty Company and him that, on the ninth day of May, 1924, a written contract was entered into between the Realty Company as party of the first part and him as party of the second part, reciting his lease and stating that, "in consideration of the mutual benefits each to the other accruing by virtue of the provisions hereof and of one dollar each to the other in hand paid," it was agreed as thereinafter set forth. Then followed a description of certain alterations and improvements in and upon the premises which it was agreed might be made by party of the first part according to certain plans and specifications identified and further agreements for

the use of second party's floor space, if found necessary in making such improvements, and for the removal of second party's property therefrom, if desired, and for the temporary suspension of elevator service as might be necessary. It was also agreed that there should be no abatement or diminution of rent payable by defendant Shapiro during the period and concluded with the following:

"This agreement does not constitute any modification, alteration, change, diminution or enlargement of the said lease, executed by second party and Childs Company and assigned to first party, covering said second floor of said premises, but said lease shall be and remain in full force and effect as to all of its provisions and agreements, except that the provision on page 2 of said lease as to termination under certain conditions, is hereby cancelled and struck out of said lease."

Nathan Rieger, a witness for the plaintiff, upon trial testified as to the negotiations had with Shapiro leading up to the execution of said contract of May 9; and we quote the following from his testimony:

"Q. What did he say? Did he come to see you? A. He came down and wanted to talk about withdrawing this notice and putting the lease back to the same effect as it was before.

"Q. Tell what he said to you and what you said to him about withdrawing the notice, if anything, and about the money and so on. A. Before the notice was given, we talked to him about we would have to give him notice and we would have to put up the money in order to pay it when the time came, and after this notice was given, he came down and talked to us about remaining in there and withdrawing the notice and putting the lease back to the same effect as it originally was. When we started to talk about that he suggested that we have our attorney draw up a paper agreement, put the lease back to the same effect it was, and withdraw whatever notice we might have given him already to vacate the premises." . . ..

"Q. Now after he received this notice and prior to May 9, 1924, did you have only one conversation with him, or did you have several conversations with him, about putting things back the way they were? A. No, that went on a half dozen times or more, talking back and forth.

"Q. Did you finally come to some understanding or agreement with him as to letting you go in there and make the improvements? A. Yes, on May 9th there was an agreement drafted or signed.

"Q. I mean prior to the actual drafting of it, did you come to some oral understanding with him? A. Yes, he asked me to have it drawn by our attorneys, so we could go to work and put the lease back as it was." . . . .

"Q. Did Mr. Shapiro know that this $3500 at the Commerce Trust Company was your money? Did you state anything to him about it?

A. In the original negotiations, we asked him to consent to our remodeling the building, and I told him if he did not consent, we would have to ask Childs Company to give him the notice, and naturally we would have to put this money up, we were going to buy this lease.

"Q. Now between the date of the service of the notice of cancellation and the date of the contract of May 9, 1924, in any conversation, you had with Mr. Shapiro did he say anything about knowing that it was your money in the bank, and did you tell him it was your money in the bank? What if anything was said about that?

"(Mr. Trusty: Objected to as being intentionally and purposely leading and suggestive. The Court: State anything that was said about that. Objection sustained.)

"Q. What was said? A. I don't think there was anything said after this notice, that I remember at all, about the $3500. The conversation about the $3500 occurred before this March notice—that is my recollection" . . .

"Q. The only time you told him, yourself personally, I mean, that your company was going to put up $3500 was before you served notice to terminate? A. I would like to answer the way I answered before, and I will try—.

"Q. (interrupting) Answer yes or no—to terminate the lease. A. I say that talk came around the time this notice was served."

The witness further testified on cross-examination as to the result accomplished by the written agreement of May 9. We quote from his testimony the following:

"Q. This agreement of May 9, 1924, was prepared by Mr. Moe Friedman, wasn't it? A. Yes, sir.

"Q. After you had talked with him about all the arrangements that you were trying to make with Sam Shapiro? A. It embodied the thoughts of Mr. Shapiro and ourselves.

"Q. And you gave them to Moe Friedman? A. Yes.

"Q. And this is the finished product, this agreement of May 9, 1924, that he turned out after you talked to him? A. Yes. It was at Mr. Shapiro's request that we put the things in that we did.

"Q. And when that was signed, by Sam Shapiro, on May 9, 1924, it was the finished product of these negotiations? A. Yes."

With reference to such negotiations, Alexander Rieger also testified; and we quote the following from his testimony:

"Q. Did you have anything to do with the negotiations yourself? A. No, sir.

"Q. Did you ever have a conversation with Mr. Shapiro, either prior to or after May 9, 1924, in which you told him that if he would sign that agreement of May 9, 1924, that he would receive $3500?

"(Mr. Trusty: Objected to as leading and suggestive. The Court: Objection sustained, change the form of the question.)

"Q. Did you ever have any conversation with Mr. Shapiro about $3500? A. I have not.

"Q. And especially with reference to a date say three or four weeks prior to May 9, 1924, on that date, did you have any such conversation? A. No, sir.

"Q. Did you have any conversation with him about $5000? A. No, I never had any conversation with him about $5000.

"Q. Did you ever have any conversation about paying him anything? A. I did not."

Sam Wedlan, secretary of plaintiff and vice-president of the Realty Company, being inquired of as to his knowledge of matters involved in said negotiations, testified with reference thereto; and we quote the following from his testimony upon the trial:

"Q. Do you recall that some $3500 was put up in the Commerce Trust Company? A. Yes, sir.

"Q. What do you know about that, what is your recollection about the $3500, being put up with the Commerce Trust Company—did you handle or have anything to do with it, or know anything about it? A. Yes, I served notice on Mr. Shapiro and told him we had placed $3500 with the Commerce Trust Company on deposit. . . .

"Q. At the time you served this and told him the bank had put up $3500 with the Commerce Trust Company, how did that come up, and what was said about that—what did you say to him and what did he say to you? A. It was very simple—I merely handed the notice to him, and told him we had made this deposit with the Commerce Trust Company.

"Q. Did he say anything? A. No, not that I remember.

"Q. Well do you recall that on May 9, 1924, a contract was entered into with Mr. Shapiro, whereby he continued his lease? A. Yes, sir.

"Q. Did you see Mr. Shapiro between the time you served this notice of cancellation and the time that this contract of May 9th was made? A. I did.

"Q. Did you have any conversation with him? A. Yes, I talked to him quite frequently.

"Q. In any conversation was anything said about cancellation, or the money, the $3500 or not? A. No, sir."

The witness Nathan Rieger also gave his deposition in this cause; and we quote the following from his testimony therein read upon the trial:

"Q. Well, during your negotiations this contract or agreement of May 9th, was this $3500 ever mentioned? A. I don't think a thing was ever said about the $3500. The only thing was that the original lease was to go back the same that it was, and the cancellation notice was to be—the notice of the cancellation was to be taken back and the

lease was to continue on the same basis as before, with the one exception of the provision for cancellation during the term was to be stricken out. . . .

"Q. Did you ever discuss with him his right under his contract or lease with the Childs Company? A.. I don't think I ever discussed that with him at all, as I recall.

"Q. Or his right under that lease subsequent to the notice to vacate that was served upon him? A. I don't recall that I ever talked to him about the $3500 at all." ·

The defendant Shapiro testified upon the trial with reference to the thirty-five hundred dollars to the effect that such sum was frequently mentioned between him and the Riegers during the negotiations for the contract of May 9, always to the end that he was to get it and never that he was not to get it; that Nathan Rieger advised. him that his right thereto would not be affected by such contract and that he signed it with such understanding; that the Riegers were anxious to enter and make the improvements desired and frequently urged that, as he was getting the $3500 from Childs Company, he should allow them to enter and make the improvements; that he asked of them an additional sum of $5000 for immediate possession but that they refused to give it, stating that he was to get $3500 of the Childs Company and Nathan Rieger upon one occasion in effect told him that if he was at any expense in a suit at law to collect the $3500 he might help him; that subsequent to May 9 he asked to be released of his contract and Rieger agreed to release him if he would release any claim to the $3500, to which he failed to consent; that he made no demand for the money deposited with the Commerce Company because he knew nothing about the deposit and he was looking to the Childs Company for the money. He remained in possession of the premises after October 1 under his lease with the Realty Company until late in the fall when he sold and assigned the same, receiving the sum of $1500 from his assignee therefor.

It is disclosed by the record that the sum with the Commerce Company was not subject to Shapiro's order and that it could only be paid him upon the written consent of both the Realty Company and the Childs Company. He made no demand of the Commerce Company for it until he was notified by it in December that the deposit had been made with it, and the Commerce Company at the same time asked him to agree to the release of the same to the Realty Company. He, then, through his attorneys, made demand of the Commerce Company for it, which demand proved fruitless.

It is further disclosed by the record that the Realty Company, on the thirty-first day of May, 1924, dissolved as a corporation while this $3500 was still in escrow with the Commerce Company and adopted a resolution stating that it had no assets and that there were no outstanding obligations held by anyone against it.

The plaintiff claims to have acquired such rights as the Realty Company had to the $3500.

The plaintiff made no effort to take down the deposit until in the fall of 1924 when in December of that year it appears there was correspondence between it and the Commerce Company concerning it.

The witness Nathan Rieger further testified with reference to matters upon the trial which induced the giving of the notice terminating Shapiro's lease and which throw some light upon the consideration for the contract of May 9. We quote the following from his testimony:

"Q. Now, Mr. Rieger, I will get you to state at the time of the acquisition of the stock of the Columbia Realty Company, if it was the intention or desire of the Home Trust Company to remodel and alter and improve the building which you were going to acquire for banking purposes? A. The object of our buying this stock of the Columbia Realty Company was to occupy the building for our own use, that is the first floor and basement, and in order to make it tenantable for us, we had to do considerable remodeling, and while we were doing it for the bank, we wanted to do the remodeling for the entire building, in the way of improved elevator service, sprinkler system, enlarge the building lobby, and make such improvements that would better the building for tenants as well as for our own use.

"Q. Did you have plans and specifications drawn up for that purpose? A. Greenebaum, Schumacher and Hardy drew plans to that effect.

"Q. At about the same time, did you have interviews with the various tenants in the building, to see if that would be agreeable to them? A. We went to each tenant, and told them what we wanted to do, what we would like to do in order to make it more tenantable.

"Q. Did you get the consent of all the tenants? A. All but Mr. Shapiro.

"Q. What was Mr. Shapiro's attitude? A. He didn't want us to do the improving, he didn't want to be without elevator service, although we were intending to put in a better elevator, he didn't want to consent to anything at all.

"Q. Now, Mr. Rieger, when you discovered that Mr. Shapiro would not consent to these proposed alterations or improvements, did you acquire any knowledge or information as to the conditions of his lease, and what you had a right to do? A. Before buying this property from Childs Company, before buying their leases, we wanted to know the condition of the lease as to the other tenants, and in looking them over, we found this provision in the Shapiro lease, so we, during our negotiations with him, had several conversations, and we told him if he would not give consent for our doing the work, we would have to give him notice, that is, according to the lease with Childs Company, give him notice, and that we would have to put up the money neces-

sary to cancel the lease. Those conversations went on until we found we could not get his consent for the alterations, so we asked that this notice be given.''

Thereafter, the notice of termination was given, and the Realty Company deposited with the Commerce Company the sum of $3500 to indemnify the Childs Company. The witness further testified:

''Q. After this agreement was signed of May 9, 1924, did Mr. Sam Shapiro ever come around to you and ask you for $3500? A. No, sir.

''Q. Did he, to your knowledge, ever go to the Commerce Trust Company and try to get the $3500? A. Not until after we went over there to ask them to return it.

''Q. Tell the court when you went to get the treasurer's check and what occurred. A. When we originally put up the funds, we arranged with the officials of the Commerce Trust Company and asked them to hold the check, which was no more or less than a personal check and the funds did not leave the bank; so during all the time we were remodeling this building, and I had a tickler on my desk to pick up this check, and in the latter part of 1924, I asked Sam Wedlan to go over or write a letter, I don't recall which I did, and to ask them to return this check, and he went over there or wrote the letter, and that would be the time—the first time we knew there was any litigation or any complaint that we were not to receive the check back.

''Q. How did it happen you did not pick up the check before that date? A. There was no reason—we were not out anything, because the check was just being held, and that is about the only reason I can say—we were not out anything at all.''

Pursuant to said contract of May 9, the Realty Company proceeded to remodel and make the alterations, repairs, and improvements upon the building. The interference with Shapiro's place of business and the consequent disturbing effect upon his business by the making of such improvements and the doing of said work as shown in the evidence constituted a substantial consideration on Shapiro's part, in permitting the entry prior to the termination of his lease while he was still required to pay rent.

Defendant Shapiro, failing to be paid the sum of $3500 on October 1, the date of the termination of the Childs Company lease, or thereafter, by the Childs Company or other party, on the sixteenth day of January, 1925, as plaintiff, filed suit in the Circuit Court of Jackson County at Independence against the Childs Company, the Commerce Company, and the Realty Company and thereafter, upon trial, recovered judgment against the Childs Company for the sum of $4281.08, having prior to the trial dismissed as to the other defendants therein. Upon appeal from said judgment by the defendant Childs

Company to this court, said judgment was affirmed upon *remittitur* of $109.08 in the sum of $4172.

Following the affirmance of said judgment by this court, this suit was filed in the Circuit Court of Jackson County at Kansas City, Missouri, by the plaintiff against the said Shapiro, the Commerce Company, and the Childs Company as defendants on June 8, 1929, by which suit it seeks permanently to enjoin the defendant Shapiro from collecting or assigning the said judgment so obtained by him against the defendant Childs Company in the circuit court at Independence and to enjoin defendants Childs Company and Commerce Company from making payment of the same to him by which it further seeks judgment against him for damages for alleged breach of contract in a sum equalling the said judgment recovered by him against Childs Company at Independence with interest and costs added and to have such judgment, if obtained by plaintiff, set off against the Independence judgment.

On the nineteenth day of June, 1929, plaintiff filed an amended petition upon which it later proceeded to trial. The grounds of its action fully appear from the same. In such amended petition, it alleged the original lease from the defendant Childs Company to the defendant Shapiro, that notice of the termination thereof was given in writing pursuant to the terms of said lease effective October 1, 1924, and that the thirty-five hundred dollars in said lease provided to be paid Shapiro upon such termination would be paid him in cash on said date; and it made further allegations, which may be summarized as follows:

"That after receipt of the notice of termination of the lease, Shapiro importuned Columbia Realty Company to reinstate his lease and to cancel and withdraw the notice of termination.

"That it was agreed between Columbia Realty Company and Shapiro that the notice of cancellation should be and was cancelled, abandoned and withdrawn and that, pursuant to such agreement of cancellation and withdrawal of the notice of termination, Columbia Realty Company and Shapiro later, on May 9, 1924, entered into a written contract whereby they agreed that the original lease should be reinstated and continued and remain in full force and effect, except that the provision for termination in the future should be stricken out.

"That Columbia Realty Company had agreed with Childs Company to pay all sums of money required to be paid and to save Childs Company harmless from payment of same on account of the termination of Shapiro's lease and, to that end, had deposited $3,500 with Commerce Trust Company; that Shapiro was informed and knew that Columbia Realty Company had so obligated itself and knew that the $3,500 deposited was money of Columbia Realty Company.

"That having such knowledge he obtained the consent of Columbia Realty Company to withdraw the notice of termination and to rein-

state his lease, himself believing, and knowing that Columbia Realty Company understood and believed, that such withdrawal of the notice of termination and by such reinstatement of the lease, any right Shapiro would otherwise have had to collect $3,500 was terminated and ended.

"That, in legal effect, Shapiro agreed to save Columbia Realty Company harmless on account of its prior agreement with Childs Company.

"That notwithstanding such agreement Shapiro proceeded to bring a suit against Childs Company in which he first made Columbia Realty Company defendant but afterwards dismissed as to it and eventually recovered against Childs Company a judgment for $3,500 being on account of the same liability which he had previously agreed with Columbia Realty Company that Columbia Realty Company would not need to pay, and that he was threatening to sue out execution against Childs Company.

"That Home Trust Company has succeeded to all assets, liabilities, rights and obligations of Columbia Realty Company.

"That Shapiro is insolvent; that a money judgment against him is not collectible; that if Childs Company paid the judgment against it or if the money in the Commerce Trust Company was turned over to Shapiro, on account of the insolvency of Shapiro, any remedy or recourse Home Trust Company might have against Shapiro would be lost by reason of such insolvency.

"That on account of the agreement with Shapiro and representations of Shapiro to the effect that the notice of termination would be and was cancelled, abandoned and withdrawn, Shapiro is estopped to assert that he is entitled to collect the judgment he recovered against Childs Company, or entitled to the beneficial interest in said judgment.

"That Home Trust Company and Columbia Realty Company have been damaged by the breach of Shapiro's agreement with them; that the amount of damage is an amount equal to judgment, interest and costs recovered by him in his suit against Childs; that a judgment for such amount should be rendered in favor of Home Trust Company, and upon its rendition, the two judgments set off, one against the other.

"The prayer of the petition was that pending final hearing, restraining order and temporary injunction should be issued against Shapiro from collecting his judgment against Childs; that upon final hearing, judgment should be rendered in favor of plaintiff for the damages sustained by it on account of the breach of Shapiro's agreement and the judgment thus rendered set off against the judgment rendered in favor of Shapiro against Childs."

It was also asked in the prayer of the amended petition that the temporary injunction be made permanent.

To this amended petition, the defendant Shapiro filed a demurrer and, upon said demurrer being overruled, he filed an amended answer on January 7, 1931. In the amended answer, he admits certain allegations of the amended petition and denies all others and pleads that the matters and complaints set up in the amended petition were fully adjudicated in the trial of his case against Childs Company in the Circuit Court of Jackson County at Independence and that the plaintiff is estopped thereby from its claims herein.

To this amended answer, plaintiff filed reply, making general denial and making further reply thereto to the effect that Shapiro was estopped to make the defense of res adjudicata as set out in such amended answer by reason of matters made to appear in the reply which, if occasion requires, will hereinafter be more fully set out.

On January 7, 1931, S. L. Trusty, E. L. Pugh, B. M. Achtenberg, and Phineas Rosenberg filed an answer and intervening petition in which they alleged an agreement with defendant Shapiro by which they were to receive for their services as attorneys for said Shapiro one-half the amount recovered by him in his suit against the Childs Company at Independence and alleged further that, by reason of said contract and the performance of the services agreed upon, they had a fixed interest in said judgment which was not subject to any claim of the plaintiff or other persons or companies and prayed for relief consistent with the facts set forth in such answer.

On January 7, 1931, plaintiff filed answer to the intervening petition denying the agreement set up therein and, by reference, reasserted the allegations of its petition as a defense thereto and alleged that such rights, if any, that said interveners might have in said judgment were subject to the rights, claims, and equities of the plaintiff.

On the same date with the filing of the answer, plaintiff also filed a motion to strike the intervening answer and petition on the grounds that the allegations of such answer were wholly insufficient to state a cause of action or defense against plaintiff's claims and that such rights as they might have, if any, in said judgment were subject to plaintiff's rights and equities and, for the further reason, that the interveners were not parties to the suit.

On the date that the original petition was filed, June 8, 1929, a restraining order was issued requiring defendants to show cause on June 18, 1929, why a temporary injunction should not issue. On June 18, 1929, on the overruling of defendant Shapiro's demurrer, the restraining order was continued in force until the further orders of the court. On June 7, 1931, defendant Shapiro having filed a motion to dissolve the restraining order, the same was overruled and a temporary injunction was ordered to issue. On the seventh day of June, 1931, defendant filed a motion to dissolve the temporary injunction on various grounds alleged therein to the effect that there was no

equity in plaintiff's bill and that plaintiff was not entitled to the relief sought, that the facts alleged in plaintiff's petition and in defendant Shapiro's amended answer had been adversely decided to plaintiff's contention herein by the judgment in the case of Shapiro against Childs Company in the circuit court at Independence on the thirteenth day of December, 1927, and that, said judgment having been affirmed by the Kansas City Court of Appeals and having become final and binding upon the plaintiff in this case, the plaintiff is estopped by said judgment and findings therein from asserting the facts and claiming the relief prayed in this action. The case went to trial on plaintiff's amended petition, defendant Shapiro's amended answer, plaintiff's reply thereto, the defendant's motion to dissolve the temporary injunction, the intervening answer and petition of S. L. Trusty, E. L. Pugh, B. M. Achtenberg, and Phineas Rosenberg, and the plaintiff's answer thereto and motion to strike the same; and on January 5, 1932, the court, finding that the defendant Childs Company had not been served with summons, ordered the cause dismissed as to the Childs Company and found the issues for the plaintiff and against all other defendants and ordered that judgment be rendered for the plaintiff, interveners take nothing by their pleading, plaintiff have judgment against defendant Shapiro in the sum of $5208.10, such judgment be set off against the judgment rendered in favor of Shapiro against the Childs Company, both said judgments be thereby fully satisfied, Shapiro be enjoined from collecting or assigning or attempting to collect the judgment recovered by him against the Childs Company from the Childs Company or the Commerce Company or the plaintiff, and defendant Commerce Company turn over and pay to plaintiff the amount of thirty-five hundred dollars heretofore deposited with it by the Realty Company.

There is much evidence in the record introduced upon the trial, including the record in the case of Shapiro v. Childs Company and the briefs of respective attorneys and the former opinion of this court therein in addition to that hereinbefore set out, which will be referred to or set out in the course of the opinion herein as may be necessary for a full understanding of this case.

After unsuccessful motions for new trial and in arrest of judgment by the defendant Shapiro and interveners S. L. Trusty et al., this appeal is prosecuted by them to this court.

. OPINION. .

1. The plaintiff's action is for damages for an alleged breach of contract made by defendant Shapiro with the Realty Company, in which action, in addition to judgment for damages, equitable relief is sought by way of temporary and permanent injunction and set off, on account of Shapiro's insolvency. The plaintiff claims to have acquired all the assets of the Realty Company and to have become liable

for its obligations and claims further that, in consequence thereof, it has the right to bring this action.

The defendants assign numerous errors, among which they challenge the action of the trial court in finding the issues for the plaintiff and rendering judgment for the plaintiff on the grounds that the petition fails to state a cause of action at law or in equity and that there are neither pleadings nor evidence to support the judgment.

It is fundamental that the contract and the breach thereof relied upon must be clearly stated in the petition and, upon the trial, that there must be substantial evidence of the existence of the contract stated and alleged and of its breach in order to justify a judgment for the plaintiff.

The question whether plaintiff's petition states facts sufficient to state a cause of action in law or equity or upon which to base equitable relief and other questions upon this appeal may be held until it is determined whether the contention that there is no evidence to support the judgment for damages is well made; for, if such contention be determined against the plaintiff, its case must fail, regardless of such other questions or their determination.

The contract alleged or sought to be alleged in the petition, which Shapiro is alleged to have breached, is substantially to the effect that, in consideration of and by the lease contract of May 9, 1924, between him and the Realty Company, he agreed that the original lease between him and the Childs Company to the property therein described, which had been terminated by Childs Company by notice of cancellation by reason whereof there had become due Shapiro from the Childs Company the sum of $3500 thereunder, should be reinstated, continued, and remain in full force and effect, except that the provisions for termination should be stricken out for the future and that the prior notice of termination should be cancelled and that he waived his right to the said sum of $3500 for which the Childs Company had become liable to him as aforesaid, from which liability therefor the Realty Company had agreed to indemnify the Childs Company and for such purpose had deposited in escrow with the defendant Commerce Company the sum of $3500 and that Shapiro had, in legal effect, agreed that the Realty Company, as such indemnitor, would not be required to pay such sum. In the final analysis, the contract alleged is one by Shapiro with the Realty Company by which he expressly or by implication or as a result of law waived his right to the $3500 and agreed not to demand payment of the same. It is alleged that Shapiro breached said contract by his suit against the Childs Company in the Circuit Court of Jackson County, Missouri, at Independence in which he obtained judgment against it for $4172.

It, therefore, becomes necessary that there be substantial evidence in the record given upon the trial establishing the fact that Shapiro made such contract as alleged and that he breached said contract. The

burden of proof to establish such agreement and breach is upon the plaintiff.

2. The plaintiff relies upon the contract of May 9, 1924, and the negotiations leading up thereto in evidence to show such contract and contends that the real consideration for said contract was Shapiro's waiver and release of any claim to the $3500 in order to obtain a withdrawal and cancellation of the notice of termination and the complete reinstatement of the Childs Company lease. However, it is nowhere stated in said contract that such was the consideration and said sum of $3500 is nowhere mentioned therein.

It may be further noted that said contract did not reinstate Shapiro's lease with the Childs Company. By the act of the Childs Company, the lease between itself and Shapiro had been determined, for any and all purposes, except the possession by Shapiro of the premises to October 1, 1924, the payment of rent by him to such time, the delivery of the possession of the premises by him, and the payment to him by the Childs Company at such time of the sum of $3500. When the Realty Company acquired the Childs Company lease, it took such lease as the rights of the parties thereto were at that time fixed and as they then existed and subject to Shapiro's right to continue in possession to October 1, 1924, upon the payment of rent as therein provided and to his right to demand the $3500 on account of the termination of his lease October 1. The provisions in the contract of May 9 with respect to repairs was a recognition of rights remaining in Shapiro under the Childs Company lease; but the provisions for remaining over after October 1 were in effect a new lease. [Shapiro v. Childs Co., 17 S. W. (2d) 680.]

In Western Union Tel. Co. v. Pennsylvania R. Co. (C. C.), 120 Fed. 362, l. c. 384, the court said, "A valid notice terminating a lease given by a landlord or tenant cannot be withdrawn except by consent of both parties, which amounts to a new agreement and creates a new tenancy." Neither was withdrawal or cancellation of the notice of termination accomplished by said contract. (Same authorities, supra.)

The contract of May 9 was a new contract between new parties and upon new considerations and not a reinstatement of the old and amounted to a delivery of possession of the premises by Shapiro under the old contract in accordance with its termination.

3. The proposition that the real consideration of such contract may be shown to have been the waiver by Shapiro of his rights to demand the payment of $3500 due him from the Childs Company, although not expressed therein, is not questioned; but that such was the consideration for said contract is not shown by the evidence herein. The contract itself does not show it and neither does the oral evidence of the negotiations leading up thereto. According to the testimony of plaintiff's officers in the record, nothing was said about the

$3500 in the course of the negotiations. Nathan Rieger, representing plaintiff and the Realty Company in the negotiations, testified that he mentioned to Shapiro several times that, if he did not consent to entry so that his part of the building could be improved with the other part, he, Nathan Rieger, would cause his lease to be terminated and would be required to put up $3500 to pay him but that all of said conversations were prior to or around the date of the service of the notice. Nathan Rieger further testified that, after the service of notice, nothing was ever said about $3500.

Alexander Rieger testified that he never at any time discussed the $3500 with Shapiro.

Sam Wedlan testified that he served the notice of cancellation upon Shapiro and told him the $3500 had been deposited with the Commerce Company but that nothing was ever afterwards said about $3500 in any conversation he had with him.

It is true that Shapiro was called by plaintiff as a witness and stated that repeated mention of the $3500 was made in the course of negotiations to the effect always that it was coming to him and that he was to get it, that the contract, if executed by him, would not affect his rights thereto, and that he executed it with that understanding. He further testified that all of his conversations were with the Riegers.

From a consideration of all the evidence in the record, we are forced to the conclusion that there is no evidence to support the contention that the real consideration of the contract in question was a waiver by defendant Shapiro of his right to demand payment of the $3500. Upon the other hand, it convincingly appears that such was not the consideration. The consideration, so far as plaintiff was concerned, was the securing to the Realty Company of the right to enter upon the second floor of the building occupied by Shapiro and to make forthwith certain alterations, repairs, and improvements in connection with other alterations and repairs contemplated throughout the entire building at that time and the contract obligation of Shapiro for the payment of rent during the interruption occasioned by such entry and thereafter for a definite term. That this is true is abundantly shown by all the evidence in the case. The whole record contradicts the claim that the consideration for the lease was as contended by plaintiff.

4. Plaintiff contends, further, that the contract of May 9, 1924, when properly construed constitutes in equity, if not at law, a withdrawal of the notice of cancellation, reinstatement of the old lease for all purposes, and an agreement by Shapiro not to require the plaintiff to pay the $3500.

To give such construction requires that we read into such contract something that is not expressed therein, not implied from anything that is expressed therein nor from the surrounding circumstances, the

subject-matter, the relation of the parties thereto and to each other, the object to be subserved by the contract nor from the conduct of the parties with reference thereto upon and subsequent to its execution.

That it is not the province of the court to alter a contract by construction or interpretation or to make a new contract for the parties is fundamental law. The court's duty is to construe and interpret the one which they have made for themselves; and, in construing it, there is one rule to follow to which all others must give way. That rule is to get at the meaning of the contract and enforce its true intendment as judicially gathered from all its four corners. To this end, it is elementary that the subject-matter of the contract, the relations of the parties to that subject-matter, and the ordinary meaning of the language used in the contract pass in review, together with the object to be subserved by the contract. [Collins v. Truman et al., 14 S. W. 526; Donovan v. Boeck, 217 Mo. 70; Thompson v. Lindsay, 242 Mo. 53.] This rule applies equally in equity and in law. [13 C. J. 521.]

All such matters being considered as set forth in the above rule in connection with the contract of May 9, the purpose, meaning, and intent of the parties in executing the same are found to be as it appears from the ordinary meaning of the language used in the contract itself. No mention is made therein of the sum of $3500 due Shapiro or of any agreement that he was waiving its payment or that he would not further demand payment of the same. The $3500 was not a part of the subject-matter of said contract. The subject-matter of the contract was that between a landlord and tenant with respect to the terms of a new lease between them upon the property therein described, involving the surrender by Shapiro of his present right to undisturbed possession of the premises and of his right to vacate entirely and terminate his liability for rental on October 1, 1924, with the termination of his existing lease on the one hand and on the other hand the securing to the Realty Company of the right to enter and begin remodeling the premises immediately and of a contract obligation by Shapiro to continue as tenant under the old rent until July 31, 1930, all of which were live questions between them and the settlement of which constituted ample consideration. The contract created a new tenancy on the same terms as the old, except as then amended, based on the mutual rights and obligations mentioned, which did not include accrued rights of Shapiro against Childs Company; the reference therein to the old lease was only for the purpose of fixing the terms of the new lease *in futuro*. [Shapiro v. Childs Company, 17 S. W. (2d) 677.] This same contract was before this court in the above-mentioned case and was construed as above set out. The plaintiff in that case is the defendant Shapiro here; and the defendant

Childs Company in that case is the same Childs Company originally made a defendant herein and later dismissed.

There is nothing in the oral evidence by which it is shown that Shapiro made the agreement as contended for by plaintiff. The evidence of plaintiff's officers in the record is to the effect that the $3500 was never mentioned in the course of the negotiations for the contract.

This court, in the opinion in the case of Shapiro v. Childs Company, supra, said in further construing this contract in that case, ''There was no consideration expressed or implied for the release of defendant from its accrued obligations, which as to parties to the new contract was an outside matter, not necessary to their mutual *status* as lessor and lessee.'' There is no reason for departing from that construction in this case. The fact that the Realty Company had agreed to indemnify the Childs Company against liability for the payment of $3500 to Shapiro and was, therefore, ultimately liable to the Childs Company for it, if such be the fact, does not alter the situation. Shapiro was not a party to the arrangement made between the Realty Company and the Childs Company and had nothing to do with it. The Realty Company did not by such arrangement with Childs Company become liable to Shapiro for the payment of the $3500. There was not any novation of his claim against the Childs Company to the Realty Company. The Realty Company was not indebted to him on account of the $3500, and he was not making any claim against it, for he had none. The Childs Company was not a party to the contract of May 9; and the claim for $3500, its payment, waiver, or settlement were matters entirely outside the subject-matter of said contract and did not naturally belong to the negotiations therefor or fall therein or become essenial thereto.

5. Plaintiff insists that, even though nothing was said about the $3500, Shapiro, by asking that the written notice be withdrawn and his lease put back to the same effect that it was before and entering into the contract in question, waived his rights to the $3500 and, in legal effect, agreed with the Realty Company or plaintiff for it that he would not require it to pay the same, knowing that it had placed itself under obligations to pay such sum in the event his lease was terminated and that the contract must be so construed. Whatever language, if any, Shapiro may have used or whatever he had in mind regarding the $3500 during the course of the negotiations, both he and the Realty Company understood that, in any event, a new contract was required. If he had in mind the reinstatement of the old contract and the waiver of his right to $3500, either by virtue of such reinstatement or in connection therewith, it, in any event, required a new arrangement and a new contract. That breath could not be blown into the old contract so that it would be resurrected and revived and become operative as formerly, as if it had never been terminated and the rights fixed thereunder ignored, is evident; and

nothing of that kind was attempted or relied upon. If he merely desired an arrangement for the future upon the same terms as the old, it took a new contract for such purpose. If he desired a new arrangement entirely for the future, a new contract was required. That a new contract was necessarily implied from whatever he might have said or had in mind was intuitively grasped by both him and the Realty Company, for the matter was at once referred to the Realty Company's or plaintiff's attorneys to make a new contract. They both knew and understood, when it came to making a new contract, that what might be accomplished by the contract would depend upon the subject-matter included and their agreements with respect thereto as set out therein. The effect of a written contract depends upon both what is included therein and what is omitted therefrom. They both understood that whatever was agreed upon in the negotiations must, to become effective, be included in the new contract when made. By the new contract as made, Shapiro did not get one putting back the old as made nor one to the same effect nor one reinstating the old. He got a new contract with many new and material provisions therein, giving him the right to continue in possession of the premises to the date specified in the old lease for its expiration, upon the old rentals, without being subject to termination prior to that time but subject to a right given the Realty Company or plaintiff for it to enter the premises forthwith and make elaborate improvements, which right granted the Realty Company was entirely foreign to the old contract. Whatever language Shapiro may have used, if any, in the course of the negotiations, the contract actually entered into does not express any agreement or anything from which an agreement might be implied with respect to the waiver of his right to the $3500 or of any agreement that he intended to do so. Plaintiff relies wholly upon the language claimed to have been used by Shapiro during the negotiations and the contract itself—that he wanted the notice of termination withdrawn and the lease put back to its old effect—to bring the alleged agreement of waiver within the purpose of the contract. Shapiro says that he signed the contract with the understanding that his right to the $3500 due him from Childs Company was not to be affected thereby and that he would get such sum from that company and that the Riegers repeatedly so advised him. However, neither asked that any agreement respecting the $3500 be incorporated in the contract, and none was. Evidently, none was intended to be. The contract as written is presumed to contain the matters agreed upon in the course of the negotiations therefor; and it is presumed that all the matters agreed upon were merged therein, regardless of what may have been presented and discussed. [13 C. J. 544; Tuggles v. Callison, 143 Mo. 527.] Nathan Rieger in his testimony says that it does represent all that was agreed upon and is the finished product of all their negotiations. If Shapiro's language indicated a purpose

to obtain a contract different in intent and purpose from the one obtained as shown by its language used and one by which he waived his right to the $3500, evidently, he did not procure such agreement. If he did, then such agreement should have been reflected in the contract. If the Realty Company or plaintiff for it was of the opinion that Shapiro by his language used was intending to waive his right to the $3500, it seems strange that it did not at least make inquiry to ascertain if such was his intention and had such fact incorporated in the contract. Further, it is not likely that Shapiro intended to waive the $3500 in the face of the proposed entry by the Realty Company by which his place of business would be invaded and torn up and blocked for months, as shown by the record, without some adequate consideration being passed to him by the Realty Company. The Realty Company secured valuable rights by the contract, including the right of entry and the payment of rent during the interruption, while all that Shapiro got was the right to remain in possession for the same length of time that he would have remained under the old lease at the old rentals had it not been terminated. To be sure, the fact that in the future he would have a better, improved place of business and thereby a more valuable location to some extent contributed some consideration; but, from the evidence in the record, it appears that it might have been entirely inadequate for the loss sustained by him from the interruption of his business. True, the $3500 was, perhaps, not intended as compensation to him for loss sustained or occasioned by an entry for repairs and improvements by the landlord under his lease; but it, nevertheless, had become an obligation due Shapiro by reason of the notice to terminate, which was induced to be given for the purpose of evicting him so that said entry might be made.

Plaintiff contends "that no apt words are used in the contract of May 9 to create a new tenancy or a new lease, no rental reserved, no term specified, and no conditions of lease mentioned and that finally it says therein that this agreement does not constitute any modification, change, alteration, diminution, or enlargement of the said lease (of Childs Company) but that said lease shall be and remain in full force and effect as to all its provisions and agreements except the provision for elimination of right of termination in the future" and that by reason thereof the old lease is in effect or reinstated and that thereby Shapiro has lost his right to the $3500 by waiver or otherwise.

However, the old Childs Company lease had not been reinstated nor was it as such in force and effect; and it was so determined by this court in the case of Shapiro v. Childs Company, supra. It was there held that the contract of May 9 was a new contract and that the reference to the Childs Company lease therein was merely for the purpose of fixing the terms of the new lease. That construction, we follow in this case. But suppose, for the moment, that we should con-

cede the plaintiff's contention, what would be the result so far as Shapiro's right to demand the $3500 is concerned?

First, however, we observe that, if the construction given the contract by plaintiff should obtain, then the statement that this agreement does not constitute any modification, change, enlargement, and so forth of the Childs Company lease is a contradiction of the contract as written; and all of the new agreements therein would be stricken out; for such agreements certainly involve material changes in and enlargement of the contract.

But to the other point—the contract of May 9 did not on the face thereof purport to unsettle anything that had been done under the Childs Company contract or to set aside any rights that had accrued or become fixed thereunder up to the time of its execution, May 9; and, besides, the language thereof declared that it constituted no change and so forth, except in the elimination of the right of termination and that it should be and remain in force as to all its terms and provisions. If this is to be given a retroactive effect, then the right of Shapiro to demand the $3500 is certainly confirmed thereby; because one of the agreements in said contract made provision for the termination and for the payment to Shapiro upon such termination of the sum of $3500, which termination had already been accomplished and his right to the $3500 had already become fixed; and if said contract was to be and remain in full force and effect as to all of its provisions, his right to demand his $3500 was necessarily included and thereby recognized and continued. If such language is not to be given a retroactive effect but to be for the future only, then again, of course, his right was not affected thereby; because his right had become fixed by reason of a prior termination, one in the past, and did not depend upon anything that might happen or be done in the future. So, plaintiff, in whatever direction it looks, is "hoist with his own petar."

The Realty Company had no right to assume that Shapiro intended to waive his right to the $3500 under all the circumstances reflected by the record without some statement of Shapiro's to that effect or from such waiver might have been implied. Nathan Rieger says that he did not say anything to Shapiro about it—this doubtless for the reason that he knew it would be useless and that in doing so the purpose of procuring a contract securing the right of entry might be entirely defeated. Rieger, doubtless, well knew that Shapiro had no intention of waiving such right; for the record is pregnant throughout with the suggestion that he had none and that everybody connected with the contract knew it. The waiver of this right was never obtained by the Realty Company or plaintiff for it; there is neither oral nor written evidence of any such agreement. It was a matter foreign to and wholly unexpressed in the contract of May 9 when executed; and such agreement cannot now, by construction or inter-

pretation, be read therein. [13 C. J. 535.] Neither was it an agreement which arose as the legal effect from the contract written.

6. Again, plaintiff invokes the rule that the promisor in the contract is bound according to the sense in which he apprehended that the promisee received his proposition. We have no fault to find with the legal proposition announced; but we find no facts in this case to which application of the rule may be made with the effect that the agreement contended for by plaintiff may be declared. There is no evidence that Shapiro intended to waive the $3500 or its payment to him or that he agreed not to require this payment, nor is there any evidence anywhere that he understood or apprehended that the Realty Company entered into the contract believing that he intended thereby to waive the same or not require its payment.

7. Plaintiff further contends that defendant Shapiro by his conduct in failing to make any demand of the Commerce Company for the $3500 deposited with it or any demand of the Childs Company for the payment of the $3500 due by it earlier than by his suit against it in January, 1925, shows he was no longer claiming the $3500 and had waived it or considered that he had.

With respect to his failure to demand payment of the Commerce Company, it may be said that he was not a party to the arrangement by which the deposit was left there and it was not left there subject to his order and any demand of the Commerce Company would have been fruitless except upon the consent of both the Realty Company and Childs Company. However, the record does show that, upon being advised of said deposit in December by the Commerce Company and receiving a request by said company for his agreement for its release to the Realty Company, he did make a demand for the sum with it but without results. As to the Childs Company—his right to demand payment of it did not mature until October 1. He explained that he was intending in the fall to make a business trip to New York, which place is the headquarters of that company, and, on said trip, to take the matter up with it; in some manner, he was prevented from making the trip and ordered suit brought against it. There is not anything in his conduct about the matter that appears unreasonable or that is inconsistent with his claim of right to the payment of the $3500. It was useless to demand the payment before due; and that he waited several months thereafter, under the circumstances given, before asking payment, certainly is not so inconsistent with his claim as to negative and disprove it.

However, if Shapiro's right is to be questioned by reason of his delay, what is to be said of the Realty Company's delay or that of the plaintiff for it in making no effort to withdraw the deposit from May 9 until late in the fall? True, plaintiff says its recollection is that the matter was first taken up in October, but the correspondence in the record indicates it might have been as late as December. How-

ever, the exact date is immaterial. The point is, if the contract was such as plaintiff claims, the right which the Realty Company had to take the deposit down accrued May 9; and yet no effort to take it down was made until from five to seven months thereafter; and the only reason assigned for such delay is that the matter was overlooked. The same argument which plaintiff undertakes to apply to Shapiro would, if applied to plaintiff or the Realty Company under all the circumstances, be entitled to more consideration than when applied to Shapiro.

8. Plaintiff makes the further point in its brief that, if the contract falls short in law or equity of accomplishing the purpose of the parties—to cancel the notice of cancellation and to reinstate the old lease for all purposes and to express the agreement of Shapiro not to require the plaintiff to pay the $3500—then there was such a mutual mistake between Shapiro and the plaintiff as to entitle plaintiff to equitable relief to achieve that result. We are not impressed with such contention under the record in this case. In the first place, that the parties had such intention does not appear. That the Realty Company had such intention is not sufficient. It must also have been intended by Shapiro; the minds of both must have met upon such proposition; both must have understood and intended that such agreements should be expressed or such contract drawn so as to accomplish such results. [Sutter v. Raeder, 149 Mo. 297.] The evidence nowhere shows that it was ever agreed by plaintiff and Shapiro that such results were to follow from their negotiations or from the contract entered into or that it was their intention that such should follow. The evidence upon the part of plaintiff's witnesses was to the effect that the $3500 was never mentioned in their negotiations, other than that Shapiro was advised by it prior to or around the time of the giving of notice of termination that it would have to put up the $3500 to pay him. The evidence upon the part of the defendant was that it was mentioned on various occasions and always to the effect that, if he should execute the contract, he would still get the $3500, that he was to get it from Childs Company, and that he was so advised by Nathan Rieger. So, there is nothing in the record to base the finding upon that a mistake of the parties in the omission of such agreements from the written contract was made.

A mistake of law and fact may be relieved against in equity, but it must be a mutual mistake of the parties. [Cooper County Bank v. Bank of Bunceton, 221 Mo. App. 814; Cooper County Bank v. Bank of Bunceton, 288 S. W. 95; Griffith v. Townley, 69 Mo. 13; Norton v. Highleyman, 88 Mo. 621; 53 C. J. 941; Wilhite v. Wilhite, 284 Mo. 387.] A mutual mistake means a mistake shared by both parties. [53 C. J. 945; Burns v. Ames Realty Company, 11 S. W. (2d) 71.] The record does not support the claim that there was such a mistake. The contention must, therefore, fail.

9. Neither is there any evidence in the record upon which to base the contention that Shapiro knew at the time of the execution of the contract that the plaintiff had the understanding and belief that the contract would have the effect of terminating his right to require the payment of the $3500 or that he himself had that understanding and that whether he so understood that such was to be the effect of the contract or not it should, nevertheless, be reformed and given such effect. The Realty Company or plaintiff for it never at any time, so far as the record shows, disclosed that it so understood. That Shapiro himself so understood is a mere assumption. This case does not call for the rule applied in the case of Cooper County Bank v. Bank of Bunceton, 221 Mo. App. 814. In that case, the evidence shows a mutual mistake with reference to the existing *status* of a certain matter. There is no such showing in this case.

10. But, argues plaintiff, even if no contract was made as alleged in the petition, still, Shapiro, knowing of the Realty Company's obligation to Childs Company and knowing that the $3500 with the Commerce Company belonged to the Realty Company and that it understood that he was waiving his right to demand the payment of the $3500 and that he would have no right to demand such payment after the execution of the agreement reinstating the Childs Company lease, is estopped from making any claim for it. However, there was no reinstatement of the Childs Company lease and no evidence that Shapiro understood that the Realty Company understood that he was waiving his right to demand the payment of the $3500 or that he would have no right to demand such payment after the execution of the agreement of May 9. The Childs Company lease had been terminated by the notice given for that purpose; and, in the manner provided by its terms, the right of Shapiro to demand the sum of $3500 on October 1 had become fixed; and the right of Childs Company to possession on October 1 had become fixed. An agreement between the successor to the Childs Company lease or the assignee thereof and Shapiro that such lease should be reinstated was nothing more than a new agreement between such party and him and did not affect his fixed rights thereunder and did not, therefore, carry with it an agreement that the $3500 penalty due him for the termination of the old agreement should be waived by his entering into it. It amounted to a new agreement between him and a new party even though its terms in some respects or in many might have been the same as the Childs Company contract. In fact, however, it contained many provisions entirely foreign to the Childs Company lease to which the Childs Company never agreed. Such contract was not the Childs Company contract but a new contract. To say that Shapiro knew that he was waiving his right to demand the $3500 of Childs Company is a mere assumption, and there is nothing in the record upon which to base it. There is nothing in the written contract to the effect that he waived his

right to it, nor is there any expression of an understanding upon the part of the Realty Company that it understood that he was waiving such right. It should be clear that, if such agreement was had or such understanding existed and was made known to him, the written contract would have been the best place in which such could have be made to appear. The fact that it does not appear therein tends to induce the belief that such agreement was not made and that such understanding, if it existed, was not made known. If the Realty company so understood, it should have made its understanding known. was not sufficient for it to have entertained such understanding unless such understanding was made known to Shapiro or unless the terms of the contract drawn, upon which both the Realty Company and he knowingly acted, were such as to show that such was the understanding. There must be a meeting of the minds of the parties to a contract as to the terms and conditions thereof. [Sutter v. Raeder, 149 Mo. 297; Taylor v. Von Schraeder, 107 Mo. 206; 13 C. J. 264.] This meeting of the minds is not based upon some secret purpose or intention upon the part of one of the parties, stored away in his mind and not brought to the attention of the other party, but upon a purpose and intention which has been made known or which, from all the circumstances, should be known. [13 C. J. 265.] Unless the contract entered into shows that it was the intention that Shapiro's right was to be waived by him and destroyed by the contract or unless that fact be made to appear otherwise from the evidence that such was the intention of both parties and the understanding of both parties, the fact that plaintiff alone may have entertained such supposition is inconsequential and unimportant.

11. The plaintiff further argues that the Beauty Company had entered into an arrangement with Childs Company to protect it against liability and in pursuance thereof had deposited the sum of $3500 with the Commerce Company and that defendant Shapiro knew of such arrangement and deposit and, therefore, for such further reason, having entered into said contract, should not be permitted to collect his judgment against the Childs Company inasmuch as in such event the Realty Company or plaintiff for it would be compelled to respond over to the Childs Company. It must be remembered that Shapiro was not a party to the arrangement between the Childs Company and the Realty Company. It is nowhere shown that he ever knew such arrangement was made, or that the $3500 had been deposited with the Commerce Company by the Realty Company until after such deposit was made. At any rate, he, not being a party to such arrangement, was not bound to recognize it. There was no novation by reason of said arrangement of his claim against the Childs Company to the Realty Company. His demand, if any, was against the Childs Company; his right of action against the Childs Company had not been waived by him by anything said or done by him in connec-

tion with said arrangement between the Childs Company and the Realty Company. He had not been responsible for such arrangement nor for the deposit of said sum by the Realty Company. The predicament, if any, that the Realty Company became involved in by making the arrangement with the Childs Company and in depositing the $3500 was, upon the facts in the record, the result of the Realty Company's voluntary acts in the premises. It was seeking new banking quarters for the plaintiff or rather the plaintiff was seeking such quarters through it, and the location or building in which Shapiro was located was determined upon for that purpose. Shapiro was the lessee therein of the entire second floor for a term expiring in 1930 and was conducting his business there. The plaintiff, through the Realty Company, acquired the leasehold interest in said building subject to various leases held thereon by subtenants which were assigned to the Realty Company, including the lease of Shapiro. Plaintiff desired at once, through the Realty Company, to make material and extensive alterations in said building throughout; and Shapiro denied it the privilege of entering upon or interfering with his floor. There was no provision in his lease for a re-entry by the lessor for making repairs, and he had the right to deny such entry and the consequent interruption of his business. The plaintiff, thereupon, through the Realty Company, for the purpose of entering and making repairs and improvements and alterations at as early a date as possible, took advantage of the termination clause in his lease, so often referred to herein, and caused the original lessor, Childs Company, to serve notice of termination at the earliest date which could be made effective therefor, being October 1, 1924. In doing so, the Realty Company was perfectly willing to and did enter upon its arrangement with the Childs Company to indemnify it and, for such purpose, advanced and deposited the sum of $3500 with the Commerce Company.

The defendant Shapiro, upon the receipt of said notice, did not move out immediately but was apparently waiting for the effective date of the termination of his lease for that purpose; negotiations were begun between the Realty Company and Shapiro which culminated in a written contract whereby it was provided that the Realty Company might forthwith enter and make the repairs in contemplation and that defendant Shapiro might, after October 1, 1924, continue in possession of the premises until the date his original lease would have expired at the same rental without the right of termination in the lessor prior to such time. Shapiro had the right under the Childs Company lease, as above stated, to continue in possession until October 1. At the time the contract of May 9 was entered into, the Realty Company's arrangement with the Childs Company to take care of the $3500 had been entered upon by the Realty Company; it had deposited that sum to secure its purpose of entering and making

the desired alterations upon the building and was perfectly willing to give the $3500 for such privilege, even at the end of six months from such time; and, by said contract, it acquired the right to enter at once and make such improvements, which right was evidently the consideration upon its part for the making of such contract. The $3500 to be paid Shapiro by the Childs Company was wholly a Childs Company obligation and was not involved in the contract and could only have become involved therein by some agreement with respect thereto made between the parties. Nothing of that kind appears in the record. Nothing appears in the written contract. Nothing appears by implication therefrom. The record is entirely silent as to any agreement upon the part of Shapiro to surrender his claim or his right to demand payment of said sum; the plaintiff upon whom the burden to prove said agreement, if made, rested, wholly failed to do.

12. But again, plaintiff contends that Shapiro should not, after having obtained the contract of May 9 by which he was enabled to continue in possession of the premises for the same term as provided by the original lease upon the old rentals, be permitted to demand payment of the $3500 from Childs Company for the reason that the Realty Company or plaintiff for it, under the arrangement with Childs Company, will be compelled to pay the same and that it will be inequitable in view of such fact to require it to do so. The plaintiff in urging this point seemingly overlooks the fact that the Realty Company or plaintiff for it was perfectly willing to pay the $3500 to get permission to enter and make the improvements upon defendant Shapiro's possessions, regardless of whether he was willing for such entry or not, and that it might now be regarded as inequitable for it to demand of him as an additional consideration for the contract the surrender of his demand, especially after it has gotten what it wanted. He who asks equity must do equity. He must come into court with clean hands. So far as this record shows, Shapiro never upon any consideration agreed, expressly or impliedly, to waive or surrender his right to demand the $3500. There is nothing in the circumstances of this case, all considered, that makes it inequitable for defendant Shapiro to demand of Childs Company the sum due him according to the terms of the contract, even if by so doing the Realty Company or plaintiff for it be required to reimburse the Childs Company. The right to do so has not been bargained away. He did no act requiring the Realty Company to enter into its arrangement with Childs Company or any by which it was misled into putting up the $3500. Neither did he do anything to lead plaintiff or the Realty Company to believe that, if the Realty Company entered into the contract, it would be released of its obligations to the Childs Company or of its obligation to maintain the deposit with the Commerce Company or to believe that it might take down such deposit and that he would no

longer look to the Childs Company for the sum due him by it. He did no act, so far as the record discloses, which might operate as an estoppel in favor of the Realty Company or plaintiff against him (Shapiro) in his right in making his demand in the suit against Childs Company for the $3500 or that in any manner might make it inequitable for him to prosecute such suit.

The entire record considered, we are of the opinion that there is no equity in plaintiff's case as made and that it is not entitled to the equitable relief sought, regardless of whether Shapiro be solvent or insolvent, and that the injunction should be dissolved. It further follows from the conclusions reached that the plaintiff failed to show facts sufficient upon the trial to entitle it to maintain the action herein, either in equity or at law, or to entitle it to the judgment recovered herein in the trial court in that no agreement such as alleged in the petition has been shown by the evidence to have been made and therefore none breached or violated by defendant Shapiro in bringing his suit against the Childs Company in the circuit court at Independence and in recovering judgment therein against the Childs Company by which plaintiff has been damaged and there is no evidence in the record to support the judgment of the trial court.

What has been said disposes of this case. The petition is based upon the alleged agreement and other alleged circumstances in connection therewith or surrounding, upon which plaintiff's alleged equities are based and by which it seeks to estop the defendant Shapiro. The alleged agreement is not shown to have been made either directly or by implication, nor to have resulted as a matter of law or equity; and the circumstances relied upon are not such as to support plaintiff's alleged equities or claims of estoppel against defendant Shapiro or such as to entitle plaintiff to any relief or judgment whatever in law or equity from whatever angle viewed or discussed.

This case was tried as an equity case by the learned chancellor below; and it becomes the duty of this court to review the evidence, the findings, and decree below and to render such judgment as in its opinion conforms to the law and the evidence, deferring where it may to the conclusions reached by the chancellor; but, if, upon review of the entire record, it is unable to agree with his conclusions and judgment, it becomes its duty to follow its own conclusions and order judgment in conformity therewith. In this case, having reached the conclusion from an examination of the entire record that there is no evidence in the record to support the judgment below and that the judgment of the learned chancellor is erroneous, it follows that the injunction should be dissolved and the judgment throughout be reversed outright. Having reached such conclusion under this head, it becomes unnecessary to consider the other questions and issues raised by the pleadings in this case or discussed by the respective parties in their briefs. Accordingly, we recommend that, for the reasons stated,

the injunction be dissolved and the judgment of the court below be reversed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of REYNOLDS, C., is adopted as the opinion of the court. The judgment is reversed, and injunction dissolved. All concur.